IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| REGINALD DAVID LUNDY, | : | HON. JEROME B. SIMANDLE |
| Petitioner, | : | Civil No. 07-4180 (JBS) |
| | : | [Relates to Cr. No. 03-354-02 |
| v. | : | (JBS)] |
| JOHN YOST, | : | **OPINION** |
| Respondent. | : | |

APPEARANCES:

Troy A. Archie, Esq.
Old Firehouse #6
339 Front Street
Suite A
Camden, NJ 08102
     Attorney for Petitioner Reginald David Lundy

Norman Joel Gross, AUSA
Deborah Prisinzano Mikkelsen, AUSA
OFFICE OF THE U.S. ATTORNEY
401 Market Street
Fourth Floor
Camden, NJ 08101
     Attorneys for Respondent John Yost

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     This matter is before the Court upon the application of
Petitioner Reginald David Lundy to dissolve the Court's June 7,
2004 Order holding him in civil contempt (the "Contempt Order").
Petitioner and eight other individuals were indicted in May 2003
on charges of producing and conspiring to produce fraudulent
money orders purporting to have been issued by various agencies
of the United States.  During the period leading up to the trial

on these charges, Petitioner and several co-defendants sent a large number of documents purporting to create fraudulent liens or other financial interests to numerous judicial officers, court employees, and attorneys associated with their criminal case, which prompted the Court to issue an Order enjoining these individuals from creating or sending such documents.  After Petitioner persisted in creating and mailing such fraudulent financially threatening materials, the Court, after a hearing, found him to be in civil contempt and ordered that he be incarcerated until he purged himself of his contemptuous conduct by withdrawing the documents and renouncing any future intent to send such fraudulent materials.

The Court's Contempt Order has remained in place since June 7, 2004, as Petitioner has continued to create and mail the very types of documents he was ordered to cease sending. Notwithstanding his active and sustained contemptuous behavior, Petitioner has moved the Court to vacate the Contempt Order.  The Court appointed counsel for Mr. Lundy under the Criminal Justice Act and held a series of hearings, culminating with final arguments on September 15, 2008.

The central issue to be determined is whether this Court's civil Contempt Order, under which Petitioner Lundy has been confined for four years, and which Petitioner continues to

2

violate, should be vacated.  For the reasons explained below,
Petitioner's application will be denied.

## II.  BACKGROUND

### A.  Petitioner's Financial Threats and the Contempt Order

On May 6, 2003, Mr. Lundy and eight other individuals were
indicted on charges of having defrauded the United States by
producing and conspiring to produce fraudulent money orders.
(United States v. Harris, et al., Cr. No. 03-354-02, Docket Item
1.)  Since the filing of the indictment, Petitioner and several
of his co-defendants engaged in a protracted campaign aimed at
harassing numerous persons associated with their criminal case
by, inter alia, sending fraudulent financial security
arrangements and contracts to multiple judicial officers, United
States attorneys, defense attorneys, and Court personnel.  As the
Court explained in its April 22, 2004 Opinion:

> Some of the defendants, . . . [including Mr. Lundy,]
> have, from the time this matter was in its Grand Jury
> phase to the present, sent baseless documents to the
> judicial officers and prosecutors involved which purport
> to require payment for each use of their names in this
> matter, as the defendants assert that their names are
> copyrighted personal property for which they are entitled
> damages for each "infringement."  When such "invoices" or
> "affidavits of debt," typically for millions of dollars,
> are not paid, the defendants have attempted to file liens
> for such sums with the New Jersey Division of Revenue
> against the personal property of the prosecutor or
> judicial officer.
>
> . . . .
>
> By July 2003, the Court had received documents, bearing
> the signatures of the five above-named male defendants

3

> [including Mr. Lundy], which purported to constitute commercial contracts, liens, and security interests against the undersigned due to his performance of official duties in this criminal case. The United States applied for filing restrictions based on similar communications from the defendants. In papers filed with the Court, the defendants had stated an intention to file false affidavits of debt and UCC Financing Statements, based on false security agreements, with the New Jersey Department of Revenue, so that they could assert a recorded security interest in all personal assets of those involved in the case.

(Cr. No. 03-354-02, Docket Item 193 at 3-5.)

In order to restrain Petitioner and his co-defendants from continuing to carry out these stated intentions, the Court issued an Order on August 27, 2003, pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651(a), enjoining Petitioner and his co-defendants from

> sending any written communications to this Court, to any judicial officer or employee of this Court, to the United States Attorney, to any Assistant United States Attorney, to any employee or officer of the United States Department of Justice, or to any attorney appearing in this case, whether in an official or allegedly "private" capacity:
>
> (1) Which attempts to create a lien or financial interest; or
>
> (2) Which purports to state a contract with such recipient regarding any civil or commercial matter . . .

(Cr. No. 03-354-02, Docket Item 107.)  The Order further enjoined Mr. Lundy and his co-defendants from "creating affidavits of debt or UCC Financing Statements . . . based upon the abovedescribed security agreements or contracts or liens however entitled."

(Id.)

4

On June 4, 2004, Richard DiGiacomo, an employee of the United States Pretrial Services office of this Court, received a document from Petitioner entitled "Notice of Acceptance and Offer," which demanded payment of $3,730,000,000.00 as a result of actions taken by Mr. DiGiacomo in the course of his employment with the Court. (Cr. No. 03-354-02, Docket Item 242.) The document further stated that Mr. DiGiacomo's failure to pay Petitioner would result in a filing of involuntary bankruptcy against him. (Id.) The Court convened a hearing on June 7, 2004, at which Petitioner, who was represented by counsel, admitted to having created and mailed the "Notice of Acceptance and Offer" to Mr. DiGiacomo. (Id.)

Upon finding that Petitioner "received and understood this Court's Order of August 27, 2003" and that he knowingly violated that Order by mailing the threatening document to Mr. DiGiacomo, the Court concluded that there was clear and convincing evidence that Petitioner had acted in civil contempt of the Court's Order. (Id.) The Court accordingly adjudged Petitioner to be in civil contempt and ordered

> that the appropriate sanction for such civil contempt is
> incarceration until defendant Lundy purges himself of his
> contempt by acknowledging and affirming, in writing,
> under penalty of perjury, and in a manner approved by
> this Court in a subsequent Order, that he withdraws the
> document entitled "Notice and Acceptance of Offer" in
> Exhibits C-1 and C-2 which is null and void, and that he
> will not create, or help create, any similar documents
> involving the undersigned, or any judicial officer or
> employee of this Court, the United States Attorney, any

5

> Assistant United States Attorney or employee or officer
> of the United States Department of Justice, or any
> attorney appearing in this case which:
>
> (1) attempt to create a lien or financial interest or UCC
> Financing Statement; or
>
> (2) purport to state a contract with a recipient
> regarding any civil or commercial matter; or
>
> (3) assert an affidavit of debt, or amount owed, from the
> recipient's property based upon a security agreement or
> contract or lien however entitled.

(Id.)  As the discussion below makes clear, Petitioner has, to
date, failed to purge his contempt, but has instead continued to
mail the proscribed documents, even while his present petition is
being adjudicated.

**B.   Conviction, Appeal, and Subsequent Proceedings Before
       this Court**

On July 2, 2004, Petitioner was found guilty of producing
and conspiring to produce fraudulent money orders in violation of
18 U.S.C. §§ 514(a) and 371, and was sentenced on October 29,
2004 to a term of imprisonment of 120 months, which was to run
consecutively to his confinement under the civil Contempt Order.
(Cr. No. 03-354-02, Docket Item 393.)  Mr. Lundy, along with his
co-defendants, appealed their convictions to the Court of
Appeals.  On March 31, 2008, the Court of Appeals issued an
Opinion and Order finding "that each of the issues raised by
appellants is without merit" and affirming the judgments of
sentence.  (App. No. 04-4281, Mar. 31, 2008 Opinion and Judgment;
Cr. No. 03-354-02, Docket Item 540.)  The Court of Appeals

6

subsequently denied Mr. Lundy's petition for a rehearing en banc. (App. No. 04-4281, June 4, 2008 Order.)  As the Government notes, the time for Mr. Lundy to have filed a petition for a writ of certiorari with the Supreme Court expired on September 4, 2008, and Mr. Lundy appears to have made no such filing.

While the denial of Mr. Lundy's appeal and petition for a rehearing en banc and his failure to file a petition for a writ of certiorari indicate that Mr. Lundy's criminal case has concluded, he is still engaged in proceedings before this Court. On March 7, 2008, Mr. Lundy filed in the Eastern District of Pennsylvania a petition seeking habeas corpus relief, which that court deemed to be a collateral attack upon his criminal conviction pursuant to 28 U.S.C. § 2255, (Civ. No. 08-1931, Docket Item 1), which was transferred to this Court on March 20, 2008.  On August 13, 2008, the Court issued and Order requiring the Respondent to answer the allegations in Mr. Lundy's section 2255 petition.[1]  (Civ. No. 08-1931, Docket Item 6.)

C.   **Procedural History**

Mr. Lundy filed the application presently under consideration[2] on August 31, 2007, seeking to have the Court

---

[1]  The Court does not here address the merits of Mr. Lundy's section 2255 petition.

[2]  Petitioner initially styled his application an "Emergency Petition for Great Writ of Habeas Corpus," and has since characterized his petition as having been filed pursuant to 28 U.S.C. § 2241.  As the Court explains, infra, it does not treat

dissolve the Contempt Order on the grounds that the Court lacked jurisdiction to enter such an Order.  On October 4, 2007, the Court issued an Order [Docket Item 3] requiring the Respondent to answer Petitioner's allegations and scheduling a hearing for November 16, 2007 to review the status of Petitioner's contempt. Thereafter, the Court issued an Opinion and Order [Docket Items 7 and 8] denying the request made in Petitioner's initial application that the undersigned recuse himself from considering the merits of Petitioner's application.

At the November 16, 2007 hearing, counsel for Petitioner, Troy A. Archie, Esq., requested that the Court order that an evaluation of Petitioner's competency to understand and comply with the Contempt Order be performed.  In response to Petitioner's oral application, the Court issued an Order on November 21, 2007 requiring the Bureau of Prisons ("BOP") to conduct an evaluation of Petitioner's mental competency [Docket Item 10].  Petitioner was transferred to the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), where he was evaluated by Dr. Shawn E. Channell, Ph.D, a forensic psychiatrist.  In his evaluation, dated April 14, 2008, Dr. Channell determined that

---

Mr. Lundy's application as a section 2241 petition, but, rather, as an application to vacate the Court's Contempt Order in the underlying criminal case.

> Mr. Lundy has never experienced symptoms consistent with a major mental illness or cognitive condition that would significantly impact his ability or capacity to understand information provided to him, including information as it pertains to his understanding of his current legal situation. Further, Mr. Lundy does not experience symptoms of a mental or cognitive condition which would affect his ability to withdraw previously filed documents or his ability to refrain from filing such documents in the future.

(Docket Item 21 at 10.) Dr. Channell concluded that Mr. Lundy's behavior is consistent with the belief system of a subculture known as the "redemptionist" movement, which, in brief, espouses the theory that "in 1933, a bankrupt United States converted its populace into assets against which it could sell bonds as collateral." (Id. at 8.) According to Dr. Channell, while "the entire redemptive belief system is erroneous[,] . . . [it] is one held by [] an organized subculture in the United States and is therefore neither delusional nor indicative of a mental illness." (Id. at 9.)

At a hearing convened on May 21, 2008, counsel for Petitioner requested permission to conduct an independent psychological evaluation of Petitioner's capacity to purge himself of his contempt, which the Court granted in an Order entered that day [Docket Item 22]. Petitioner retained Dr. Kenneth J. Weiss to evaluate Petitioner's competency and capacity to comply with the Court's orders. Upon his examination of Petitioner and his review of the relevant documents, Dr. Weiss echoed Dr. Channell's conclusions, finding that Petitioner

9

understands the nature of the Court's orders, has the capacity to refrain from mailing documents in violation of those orders, and is competent to decide for himself whether or not to purge himself of his contempt and cease mailing financially threatening documents.[3]  (Pet.'s Br. Ex. A at 2-3.)

Throughout the course of these proceedings, Petitioner has continued to mail documents asserting fraudulent and fictitious financial claims and contracts against a wide range of recipients.  These mailings include but are not limited to the following:

- On April 8, 2008, Petitioner sent to a long list of individuals a "Notice of Fault and Opportunity to Cure and Contest Acceptance."[4]  (Ex. A-1.)

---

[3]  Rather than finding that Petitioner exhibited any signs of mental illness, Dr. Weiss – Petitioner's independent psychiatric witness – determined that Petitioner was simply "an annoying person with failed adaptations to life."  (Pet.'s Br. Ex. A at 3.)

[4]  The recipients of this document included the undersigned; United States District Judge (and former Assistant United States Attorney) Renee M. Bumb; former Magistrate Judge Joel B. Rosen; United States Attorney Christopher J. Christie; Assistant United States Attorney Lee D. Rudy; William T. Walsh, Clerk of United States District Court for the District of New Jersey; Richard DiGiacomo, Pretrial Services Officer; Eric Taylor, Warden of the Camden Correctional Institution; Phyllis Ruffin, Case Manager for the United States Court of Appeals for the Third Circuit; Marcia M. Waldron, Clerk of the United States Court of Appeals for the Third Circuit; Lori M. Knok, Assistant Federal Public Defender; Harley G. Lappin, Director of the BOP; D. Scott Dodrill, Regional Director of the BOP; Harrell Watts, General Counsel for the BOP; John Yost, Warden of the Federal Correctional Institution in Loretto, Pennsylvania ("FCI Loretto"); Jack Herron, Assistant Warden of FCI Loretto; Jeffrey Trimbath, Health Services Coordinator at FCI Loretto; Daniel James Leonard, III, Clinical

- On June 13, 2008, Petitioner sent to the undersigned a letter demanding that the undersigned complete and return to Petitioner Internal Revenue Service ("IRS") forms 1099-OID and W-9.  (Ex. A-2.)

- On June 18, 2008, Petitioner mailed to the undersigned a "Notice of Protest and Opportunity to Cure," which states, <u>inter</u> <u>alia</u>, "[y]ou are now in default . . . . This is a UCC CONFIRMATORY WRITING and STATUTE STAPLE and will be a perfected Contract upon the completion of the administrative process."  (Ex. A-3.)

- On August 6, 2008, Petitioner mailed to William Walsh, Clerk of this Court, a letter demanding that Mr. Walsh complete and return to Petitioner an IRS form 1099-OID, and stating that Mr. Walsh's failure to provide Petitioner with such form "constitutes tax fraud." (Ex. B-1.)

- Also on August 6, 2008, Petitioner mailed to the undersigned an identical letter to that which he mailed to Mr. Walsh on the same date.  (Ex. B-2.)

- On July 1, 2008, at the request of Petitioner Lundy, a notary public in Bend, Oregon named Karen L. Tappert mailed to the undersigned a document certifying that a list of financial documents, including a "Notice of Fault/Opportunity to Cure and Contest Acceptance," had been served on the undersigned on Petitioner's behalf,

---

Director at FCI Loretto; David Mooney, Lieutenant at FCI Loretto; James Krepps, a physician's assistant at FCI Loretto; Doug Auman, Unit Manager at FCI Loretto; Chris Brodmerkel, Case Manager at FCI Loretto; Rodriguez Miralles, a physician's assistant at FCI Loretto; Edward B. Motley, Warden of the Federal Detention Center in Philadelphia ("FDC Philadelphia"); Daniel S. Kulick of FDC Philadelphia; and Paul A. Blaine, Assistant United States Attorney.  (Ex. A-1.)  Each addressee is, in the words of the August 27, 2003 Order, a "judicial officer or employee of this Court . . . the United States Attorney, . . . [an] Assistant United States Attorney, . . . [an] employee or officer of the United States Department of Justice, . . . or . . . [an] attorney appearing in this case . . . ."

11

and that "the associated default has not been cured."[5]
(Ex. C.)

- At the September 16, 2008 hearing, Petitioner presented
to the Court a document naming a long list of
individuals[6] who, the document appears to suggest, had
purportedly assented to compensate Petitioner in the
amount of $14,000,000.00.  (Ex. D.)

Of the documents that Petitioner himself mailed from federal

prison, Petitioner appears to have eluded any effort of the BOP

---

[5]  At the September 16, 2008 hearing, Petitioner indicated
that Ms. Tappert had mailed the July 1, 2008 document on his
behalf, and that he stood behind its contents.

[6]  The individuals named in this document are the
undersigned; former Magistrate Judge Joel B. Rosen; United States
District Judge Juan R. Sanchez; United States District Judge (and
former Assistant United States Attorney) Renee M. Bumb; United
States Attorney Christopher J. Christie; United States Attorney
Lee D. Rudy; William T. Walsh, Clerk of United States District
Court for the District of New Jersey; Richard DiGiacomo, Pretrial
Services Officer; Eric Taylor, Warden of the Camden Correctional
Institution; Troy Levi, Warden of FDC Philadelphia; Phyllis
Ruffin, Case Manager for the United States Court of Appeals for
the Third Circuit; Marcia M. Waldron, Clerk of the United States
Court of Appeals for the Third Circuit; Lori M. Knok, Assistant
Federal Public Defender; Harley G. Lappin, Director of the BOP;
D. Scott Dodrill, Regional Director of the BOP; Harrell Watts,
General Counsel for the BOP; John Yost, Warden of the Federal
Correctional Institution in Loretto, Pennsylvania ("FCI
Loretto"); Jack Herron, Assistant Warden of FCI Loretto; Jeffrey
Trimbath, Health Services Coordinator at FCI Loretto; Daniel
James Leonard, III, Clinical Director at FCI Loretto; David
Mooney, Lieutenant at FCI Loretto; James Krepps, a physician's
assistant at FCI Loretto; Doug Auman, Unit Manager at FCI
Loretto; Chris Brodmerkel, Case Manager at FCI Loretto; Rodriguez
Miralles, a physician's assistant at FCI Loretto; Edward B.
Motley, Warden of the Federal Detention Center in Philadelphia
("FDC Philadelphia"); Daniel S. Kulick of FDC Philadelphia; and
Paul A. Blaine, Assistant United States Attorney.  (Ex. D.)

to screen his mail by labeling the envelopes containing the
documents as "legal mail."  (Exs. A-1, B-1, B-2.)[7]

Finally, while this matter was pending, Congress enacted 18
U.S.C. § 1521,[8] which criminalized knowingly filing or attempting
to file in any public record false lien claims against "any
officer or employee of the United States or of any agency in any
branch of the United States Government."  § 1114.  Thus,
effective January 7, 2008, Congress has criminalized a
substantial part of the conduct in which Mr. Lundy engages, as
discussed further below.

## III. DISCUSSION

### A.   The Parties' Arguments

The Government argues that the Court should reject
Petitioner's application to dissolve the Contempt Order.  Citing

---

[7]  The envelopes indicate that these documents were mailed
through the prison mailing systems of FDC Philadelphia (Exs. B-1,
B-2) and FMC Devens (Ex. A-1).

[8]  Section 1521 provides in full:

Whoever files, attempts to file, or conspires to file, in
any public record or in any private record which is
generally available to the public, any false lien or
encumbrance against the real or personal property of an
individual described in section 1114, on account of the
performance of official duties by that individual,
knowing or having reason to know that such lien or
encumbrance is false or contains any materially false,
fictitious, or fraudulent statement or representation,
shall be fined under this title or imprisoned for not
more than 10 years, or both.

18 U.S.C. § 1521.

the findings of Drs. Channell and Weiss that Petitioner has the capacity and competency to comply with the Court's orders, the Government first emphasizes (quoting an earlier Opinion of this Court) that "in the civil contempt context, there is a critical distinction between, on the one hand, a noncompliant contemnor who is unable to comply with a court order, and, on the other, one who persists in defying a court order notwithstanding his capacity to comply." United States v. Harris, No. 03-354, 2008 WL 482347, at *4 (D.N.J. Feb. 20, 2008) (citing Chadwick v. Janecka, 312 F.3d 597, 609 (3d Cir. 2002) and Armstrong v. Guccione, 470 F.3d 89, 111 n.9 (2d Cir. 2006)).  According to the Government, Petitioner's knowing defiance of the Court's orders should not be rewarded through the dissolution of the Contempt Order simply because Petitioner's contumacious behavior is persistent.

The Government also argues that the conclusion of Petitioner's criminal case does not eliminate the need for sustaining the Contempt Order under the present circumstances. As the Government recognizes, in most cases, coercive civil contempt sanctions "ordinarily abate when the proceedings out of which they arise are terminated, because the need for getting a party to act in the underlying litigation ends when the litigation ends." United States v. Slaughter, 900 F.2d 1119, 1125 (7th Cir. 1990) (internal quotations and citations omitted).

14

The Government argues, however, that coercive civil contempt sanctions may survive the termination of the underlying litigation when the need for the sanction persists, notwithstanding the conclusion of the litigation itself.  See id. at 1125-26.  Such a need exists in this case, the Government argues, in which the Contempt Order was entered not "for evidentiary, trial-related or other purposes tied to the pendency of the proceeding," but, instead, for "general law enforcement purposes."  Id. at 1126 (internal quotations and citations omitted).

Petitioner urges the Court to dissolve the Contempt Order. Mr. Lundy himself argues, as he has throughout the underlying criminal case, that because the Court lacked the authority and "commercial energy" to adjudicate the criminal charges filed against him, it consequently lacked the authority to hold him in civil contempt.[9]  Counsel for Petitioner, while conceding that Petitioner is capable of bringing himself into compliance with the Court's Order, argues that the Court should vacate that Order, notwithstanding Petitioner's active noncompliance, because

---

[9]  The Court will not address this fatuous claim, which was raised and addressed repeatedly throughout the underlying criminal proceedings, except to note that because it has "original jurisdiction . . . of all offenses against the laws of the United States," 18 U.S.C. § 3231, the Court had the authority to adjudicate the underlying criminal charges against Petitioner. The Court of Appeals, in affirming Petitioner's conviction, necessarily affirmed this Court's jurisdiction.

15

the enactment of 18 U.S.C. § 1521 indicates that there is no longer a "need or purpose for the coercive contempt order." Slaughter, 900 F.2d at 1125.  That is, because it is now illegal to knowingly "file, or conspire[] to file, in any public record or in any private record which is generally available to the public, any false lien or encumbrance against the real or personal property" of United States officers and employees, § 1521, Mr. Lundy's attorney argues that if this statute itself does not deter Mr. Lundy's mailings, then prosecution under section 1521 would more effectively and more appropriately target Mr. Lundy's conduct than would the Contempt Order.[10]

**B.   Findings of Fact**

Based on the evidence in the record reviewed above, the Court makes the following findings of facts that have been established by clear and convincing evidence.

---

[10]   In a written submission to the Court, counsel for Petitioner suggests not only that the Court should vacate the Contempt Order, but that it should allow Petitioner credit for "time served retroactively and coterminous from the date of arrest in the within matter."  (Pet.'s Br. at 5.)  Petitioner arrives at this conclusion through a misguided reading of Teague v. Lane, 489 U.S. 288 (1989), under which new criminal statutes, including 18 U.S.C. § 3231, would be applied retroactively.  This argument is unpersuasive, to say the least.  Teague pertains to the retroactive application in collateral proceedings of newly announced "watershed rules of criminal procedure."  Teague, 489 U.S. at 311.  Fortunately for Mr. Lundy, the Ex Post Facto Clause of the Constitution prohibits the retroactive application of a new criminal statute to previously non-criminal behavior.

16

1.   While Petitioner's behavior may appear irrational, the Court finds that he is competent – that is, that Mr. Lundy understands this Court's orders and is able, if he so chooses, to bring his conduct into compliance with these orders.  As Drs. Weiss and Channell found, Petitioner "understands the nature of his post-conviction behavior, its effect on others and the judge's Order," (Pet.'s Br. Ex. A at 2), and he "does not experience symptoms of a mental or cognitive condition which would affect his ability to withdraw previously filed documents or his ability to refrain from filing such documents in the future."  (Docket Item 21 at 10.)

2.   Petitioner has failed to purge himself of his contempt of the Court's August 27, 2003 Order.  The above-cited list of exhibits demonstrates that Petitioner continues to create, mail, and instruct others to mail documents to judicial officers, Court employees, United States Attorneys, defense attorneys, and others which falsely inform the recipients that they have defaulted on fictitious financial obligations owed to Petitioner.  (Exs. A-1, A-2, A-3, B-1, B-2, C, D.)

3.   The enactment of 18 U.S.C. § 1521 has not deterred Petitioner from mailing these documents.  Petitioner is indeed aware of the statute.  Petitioner was present at a hearing on May 21, 2008 in this matter, at which the Court and counsel discussed the statute and its impact on the legality of Petitioner's

mailings, he has received briefs reciting the statute, and he has nonetheless persisted in mailing the documents at issue here. (Exs. A-1, A-2, A-3, B-1, B-2, C, D.)  If anything, the rate of Petitioner's mailings of false and fraudulent financial demands, contracts and claims has accelerated since the enactment of § 1521.

4.  Petitioner's frequent oral statements in Court, including at a hearing convened on September 16, 2008, show that Petitioner has no intention of ceasing his threatening mailings or recognizing this Court's authority to require him to cease.

5.  Although Petitioner is confined, he has been able to subvert the measures the BOP has in place to prevent prisoners from abusing the mail system.  Petitioner has succeeded in sending his contemptuous mailings from prison by falsely labeling envelopes containing these mailings as "legal mail."  (Exs. A-1, B-1, B-2.)  Additionally, Petitioner has enlisted the assistance of outsiders in sending documents, including a notary public in Bend, Oregon, who has mailed on Petitioner's behalf documents falsely alleging that the recipient has defaulted on a debt owed to Petitioner.  (Exs. A-3, C.)

   **C.  Analysis**

For the following reasons, the Court will deny Petitioner's application to vacate the Contempt Order.  Initially, the Court notes that, because "[a] finding of contempt must rest on clear

18

and convincing evidence," <u>Harris v. City of Philadelphia</u>, 47 F.3d 1333, 1340 (3d Cir. 1995), the burden in this matter will fall on the Government to prove by clear and convincing evidence that Petitioner has failed to purge himself of his contempt and that he has the capacity to do so.[11]

The Court begins by reviewing the Contempt Order itself. Notwithstanding Petitioner's characterization of the Contempt Order as a criminal contempt sanction, the Court has made clear from the outset that the Contempt Order adjudged Petitioner to be

---

[11] The Court exercises jurisdiction in this matter under the All Writs Act, 28 U.S.C. § 1651(a). The Contempt Order in this case was entered pursuant to the Court's "inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner." <u>United States v. Dowell</u>, 257 F.3d 694, 699 (7th Cir. 2001) (citation omitted); <u>see also Taberer v. Armstrong World Industries, Inc.</u>, 954 F.2d 888, 899 (3d Cir. 1992) (recognizing that the "contempt power is inherent in the courts").

Regarding the Court's authority to entertain the application presently under consideration, the Court recognizes that Petitioner has characterized his submission of this matter as having been filed pursuant to 28 U.S.C. § 2241. Because Petitioner is not confined within this judicial district, the Court recognizes that it cannot exercise authority over this matter pursuant to the statute invoked by Petitioner. Instead, the Court treats Mr. Lundy's submission as an application to vacate the Court's Contempt Order in the underlying criminal case. As this Court has explained,

> [t]he Court has jurisdiction to review its own contempt citation under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

<u>Harris</u>, 2008 WL 482347, at *3.

in _civil_ contempt, and imposed the coercive sanction of
imprisonment not to punish Petitioner's past noncompliance with
the Court's orders, but to compel future compliance.  (Cr. No.
03-354-02, Docket Item 242.)  As the Court of Appeals has
explained:

> In determining whether a contempt sanction is civil, it
> is generally useful to examine the form of the relief
> granted.  When the relief provided is imprisonment, the
> contempt proceeding is civil if the defendant stands
> committed unless and until he performs the affirmative
> act required by the court's order.  As a result, it is
> often said that the imprisoned civil contemnor carries
> the keys of his prison in his own pocket.

_Roe v. Operation Rescue_, 919 F.2d 857, 868 (3d Cir. 1990)
(internal quotations and citations omitted).  The sanction
imposed in this case is manifestly one of coercive civil
contempt: under the terms of the Contempt Order, Petitioner is to
be confined until, and only until, he withdraws his fraudulent
mailings and renounces his intent to mail such documents to
specified individuals in the future.[12]  (Cr. No. 03-354-02,
Docket Item 242.)  The Court has further indicated, in hearings
herein, a willingness to dissolve the Contempt Order if
Petitioner merely ceases this offending conduct and states his

---

[12]  As the Supreme Court has noted, "[t]he paradigmatic
coercive, civil contempt sanction . . . involves confining a
contemnor indefinitely until he complies with an affirmative
command."  _International Union, United Mine Workers of America v._
_Bagwell_, 512 U.S. 821, 828 (1994); _see also_ _Chadwick v. Janecka_,
312 F.3d 597, 608 (3d Cir. 2002).

20

intention not to resume.  This proposal has likewise fallen on deaf ears.

As the Government has noted, coercive civil contempt orders like the one at issue in this case "ordinarily abate when the proceedings out of which they arise are terminated," Slaughter, 900 F.2d at 1125, because such orders typically are aimed at coercing a reluctant individual into participating in the litigation by, e.g., attending a deposition or testifying at trial.  "Such abatement does not occur, however, when the need or purpose for the coercive contempt order survives the underlying proceeding."  Id.  Among the circumstances that may warrant the sustained application of a coercive civil contempt sanction beyond the termination of the litigation are where the sanction serves "general law enforcement purposes," id. at 1126, or where the terminated action is "closely related to" or "intertwined with" an action that remains pending before the Court such that "the cause of action out of which the contempt arose is not [considered to have] truly abated."  Petroleos Mexicanos v. Crawford Enterprises, Inc., 826 F.2d 392, 400 (5th Cir. 1987).

The Court finds that the rationales of Slaughter and Petroleos are applicable in the circumstances at issue here, warranting the sustained application of the Contempt Order in this matter, notwithstanding the termination of Mr. Lundy's criminal case.  While Mr. Lundy's criminal case may be at an end,

21

there is a closely related matter – his section 2255 petition –
now pending before this Court.  (Civ. No. 08-1931, Docket Item
1.)  The Court, its employees, and the attorneys working on the
matter of Mr. Lundy's habeas petition have an interest
participating in the orderly administration of justice without
being subjected to Mr. Lundy's financial threats.  This was
precisely the "need or purpose" justifying the entry of, first,
the Court's August 27, 2003 Order enjoining Mr. Lundy from
creating and mailing fraudulent financial documents and, second,
the subsequent Contempt Order.  Slaughter, 900 F.2d at 1125.
Unlike coercive civil contempt sanctions entered against trial
witnesses who refuse to testify, the purpose behind the Contempt
Order herein has not abated, because Mr. Lundy still is engaged
in related proceedings before this Court attacking that
conviction which are just as likely to be disrupted by his
harassment tactics as was the criminal case in which the Contempt
Order was originally entered.  See Petroleos Mexicanos, 826 F.2d
at 400.  In short, the passage of time and the conclusion of Mr.
Lundy's criminal case have not extinguished the Court's interest
in enforcing its lawful orders under the circumstances presented
here.  See id.; Slaughter, 900 F.2d at 1125-26.

The above-cited authority and the Court's ongoing interest
in the orderly administration of justice support the continued
application of the Contempt Order in this case.  The Court,

22

however, also recognizes that the upshot of Mr. Lundy's active
contumacy is that he has yet to begin serving his 120-month
sentence, because that sentence is to be served consecutive to
his civil contempt confinement.  Because it is in the Court's,
the Government's, and Mr. Lundy's interest for him to begin to
serve his sentence as soon as possible, the Court has considered
whether there are alternative measures to the Contempt Order that
would achieve the same purpose while enabling Mr. Lundy to serve
the sentence imposed for the crimes for which he was convicted;
in particular, the Court has considered whether the recent
enactment of 18 U.S.C. § 1521 is sufficient to deter Mr. Lundy's
threatening conduct, or whether the BOP could take measures to
prevent Mr. Lundy from engaging in such conduct from prison.[13]
Unfortunately, as the following discussion makes clear, the Court
does not find these alternatives to be sufficient upon the facts
and circumstances Petitioner presents.

First, as the Court found, supra, it is abundantly apparent
that the passage of 18 U.S.C. § 1521, which makes it a federal
crime to file or attempt to file in any public record fraudulent
lien claims against the property of federal employees, has not

_____

[13]   In this respect, the Court recognizes that it is within
its discretion to dissolve the Contempt Order.  The Court regrets
that Mr. Lundy has not given the Court reason to do so, and that
if there was any question as to whether Mr. Lundy would
voluntarily cease his campaign of harassment, such doubts were
removed by Mr. Lundy's statements to the contrary at the
September 16, 2008 hearing.

deterred Mr. Lundy from making false and fraudulent financial threats against those individuals who have come into contact with his case.  If anything, as the review of letters mailed between April 8, 2008 and August 6, 2008 indicates, Mr. Lundy has escalated his mailing campaign since January 7, 2008, when section 1521 went into effect.  (Exs. A-1, A-2, A-3, B-1, B-2, C, D.)

Moreover, the Court disagrees with Mr. Lundy's argument that because the Government now may determine whether or not to prosecute his conduct under section 1521, the Contempt Order should be vacated.  First, it bears noting that the scope of the Court's August 27, 2003 Order and section 1521 are not coterminous.  Whereas section 1521 proscribes filing false lien claims "in any public record or in any private record which is generally available to the public," § 1521, against the property of "any officer or employee of the United States or of any agency in any branch of the United States Government," § 1114, the August 27, 2003 Order prohibits a broader range of conduct more closely tailored to the facts of this case.  Specifically, the Order prohibits Mr. Lundy not only from filing false liens against United States employees, but also from "sending any written communications . . . [w]hich purports to state a contract with such recipient regarding any civil or commercial matter," and from "creating affidavits of debt or UCC Financing Statements

. . . based upon the abovedescribed security agreements or contracts or liens however entitled."[14]   (Cr. No. 03-354-02, Docket Item 107.)  Because some of Mr. Lundy's mailings are enjoined by the Court's Order but could not be subject to prosecution under section 1521, criminal prosecution does not appear to be an adequate alternative to the Contempt Order.

Additionally, as the Government argued at the September 16, 2008 hearing, the Court recognizes that criminal prosecutions take time to initiate, investigate, and pursue, and that the results of such prosecutions are uncertain.  Even if Mr. Lundy were to be prosecuted under section 1521, it would be a considerable amount of time before such a prosecution could be completed, whereas the Contempt Order is already in place.  While Mr. Lundy may yet be prosecuted under section 1521, a subject upon which the Court expresses no opinion, the Court does not find that the prospect of prosecution is an adequate substitute for the Contempt Order sufficient to warrant vacating that Order.

---

[14]   Additionally, in light of the fact that Mr. Lundy has targeted defense attorneys as well as United States officers and employees, the Court's Order enjoins Mr. Lundy from sending such communications "to this Court, to any judicial officer or employee of this Court, to the United States Attorney, to any Assistant United States Attorney, to any employee or officer of the United States Department of Justice, or to any attorney appearing in this case, whether in an official or allegedly 'private' capacity."  (Cr. No. 03-354-02, Docket Item 107.)  The reach of the August 2003 injunction is thus broader than section 1521 in this respect as well.

Nor does the Court find, based on the record in this matter, that the BOP's policies regarding prisoners' use (and abuse) of mail can adequately address Mr. Lundy's contumacious conduct such that the Contempt Order may be dissolved.  Whatever measures the BOP has taken to date in order to circumscribe Mr. Lundy's ability to send the financially threatening mailings enjoined by the August 27, 2003 Order have proven woefully inadequate, as the abundance of recently mailed documents summarized above makes clear.[15]  Mr. Lundy appears to have eluded such measures by falsely labeling the envelopes containing his fraudulent mailings "legal mail," (Exs. A-1, B-1, B-2), and by enlisting the assistance of outsiders – including Karen Tappert, a notary public in Bend, Oregon - in mailing his fraudulent documents. (Exs. A-3 and C.)  While the Court would revisit the ongoing necessity for the Contempt Order should the BOP institute meaningful measures – such as a tight and effective mail cover – to prevent Mr. Lundy from mailing the proscribed documents, the Court cannot, under the present circumstances, find that the

---

[15]   The Court of Appeals recently held that the confiscation of "inmate publications advocating the 'redemption' theory, UCC materials, and information on copyrighting names," which prisoners at the State Correctional Institute at Graterford, Pennsylvania could use to file bogus liens, did not violate the prisoners' First Amendment rights.  <u>Monroe v. Beard</u>, 536 F.3d 198, 207 (3d Cir. 2008).  Nothing in the record indicates whether or not a similar confiscation policy has been employed at FDC Philadelphia, where Mr. Lundy is incarcerated.

BOP's policies adequately address Mr. Lundy's disruptive activities.[16]

As the preceding discussion makes clear, the Court is not convinced that either the enactment of 18 U.S.C. § 1521 or the measures taken at FCI Philadelphia will adequately obtain Mr. Lundy's compliance with the Court's Order enjoining his fraudulent filings.  While Mr. Lundy has yet to purge his contempt and bring himself into compliance with the Court's orders, the Court agrees with the Government that the mere persistence of his contumacy does not warrant the dissolution of the Contempt Order, when both Drs. Channell and Weiss indicate unmistakably that Mr. Lundy is competent and capable of compliance.  See, e.g., Guccione, 470 F.3d at 111 n.9 (noting that "the point of Maggio[ v. Zeitz, 333 U.S. 56 (1948)] and Chadwick is precisely that there is a crucial difference between one who is capable of complying and refuses to do so and one who is not capable of complying"); Chadwick, 312 F.3d at 609; Harris, 2008 WL 482347, at *4.

---

[16]   Indeed, if the BOP, under its applicable regulations and authority, were to construct an effective screen of Petitioner's outgoing and incoming mail for evidence of possible criminal conduct under 18 U.S.C. § 1521, the Petitioner could reapply to this Court for dissolution of the civil Contempt Order.

The Court will accordingly deny Mr. Lundy's application to vacate the Contempt Order.[17]  As has been clear to Mr. Lundy throughout these proceedings, he may elect at any time to put an end to his contempt sanctions

> by acknowledging and affirming, in writing, under penalty of perjury, and in a manner approved by this Court in a subsequent Order, that he withdraws the document entitled "Notice and Acceptance of Offer" in Exhibits C-1 and C-2 which is null and void, and that he will not create, or help create, any similar documents involving the undersigned, or any judicial officer or employee of this Court, the United States Attorney, any Assistant United States Attorney or employee or officer of the United States Department of Justice, or any attorney appearing in this case.

(Cr. No. 03-354-02, Docket Item 242.)  In short, Mr. Lundy remains free to desist from his contumacy when he so chooses, at which point the civil contempt sanctions "shall cease immediately."  (Id.)

---

[17]  Nothing herein prevents Mr. Lundy from filing suit against the United States under the Federal Tort Claims Act ("FTCA")

> for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  If Mr. Lundy believes that he has suffered such an injury, he may take appropriate legal action pursuant to the FTCA.  What he may not do is continue to send false and fraudulent financial documents to individuals associated with his criminal case.

## IV.  CONCLUSION

For the reasons discussed above, the Court will deny Plaintiff's application to vacate the Contempt Order.  The accompanying Final Order will be entered.


**September 22, 2008**                    **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge

29